IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01696-WYD-MJW

TYLER JAMES SWARBRICK,

    Plaintiff,

v.

PAULA FRANTZ, MD, Chief Medical Officer, CDOC,
STEPHEN R. KREBS, MD, Director of Case Management, PHP/CHP, and
ANTHONY A. DECESARO, Step 3 Grievance Officer, CDOC,

    Defendants.

---

### RECOMMENDATION ON
### (1) PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 7)
### and
### (2) DEFENDANTS' MOTION TO DISMISS (Docket No. 30)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case was referred to this court pursuant to an Order of Reference to Magistrate Judge issued by Chief Judge Wiley Y. Daniel on August 15, 2011. (Docket No. 14).

**PLAINTIFF'S ALLEGATIONS**

The pro se incarcerated plaintiff, Tyler James Swarbrick, alleges the following in his Prisoner Complaint, which is brought pursuant to 42 U.S.C. § 1983. Plaintiff was in a car accident on September 22, 2008, and was immediately taken to Sky Ridge Medical Center where he received an emergency sigmoid resection with colostomy and Hartmann pouch. He was released from the hospital with instructions from his surgeon to return in approximately eight weeks to have the colostomy corrected. However,

before the eight weeks passed, plaintiff turned himself in when a warrant was issued for his arrest. Plaintiff was unable to post bail in order to have the standard repair performed during the recommended time period. He was sentenced on March 6, 2009, to a six-year term of imprisonment in the Colorado Department of Corrections ("CDOC").

Plaintiff arrived at Sterling Correctional Facility on April 11, 2009, and immediately on April 16 submitted to PHP (Physician Health Partners) a consult request for a colostomy reversal surgery. Defendant Stephen R. Krebs, the medical director of case management at PHP/CHP (Physician Health Partners/Correctional Health Partners) denied plaintiff's request. Plaintiff filed an ADA grievance on June 4, 2009, but it was denied on July 5, 2009. Plaintiff also filed multiple grievances and many informal pleas but was rejected. He exhausted all administrative remedies on July 15, 2010, but by that time he was two years past the recommended time frame for standard ostomy reversal surgery.

Defendant Paula Frantz is the CDOC Chief Medical Officer. All of the denials of plaintiff's surgery stem from or are the result of her classification of colostomy repair as elective. She has demonstrated deliberate indifference to a serious medical need by implementing or upholding a "broad, false opinion toward the nature of Plaintiff's condition." (Docket No. 1 at 5). Frantz's opinion influenced Krebs to deny plaintiff's surgery on July 29, 2009, in which he states his decision is based on the previous opinion of Dr. Frantz. Defendant Anthony A. DeCesaro denied plaintiff's grievance which requested the surgery. His denial was based on Dr. Frantz's opinion that ostomy corrections are elective, as well as DeCesaro's admitted lack of qualifications to

determine the necessity of the medical need he dismisses. Both Krebs and DeCesaro "have demonstrated deliberate indifference by denying Plaintiff's request based on opinion rather than verifiable, patient-specific fact." (Docket No. 1 at 5).

"All named defendants are responsible to Plaintiff's being subjected to cruel and unusual punishment by allowing Plaintiff to degenerate into a permanently maimed condition, as well as allowing Plaintiff to remain in a condition which is an excessive risk to health and safety, which causes extreme pain and discomfort, which impacts every aspect of Plaintiff's quality of life, and is recognizable as a state of great suffering by any layman." (Docket No. 1 at 5-6). "Plaintiff has experienced a great deal of suffering and humiliation due to the decisions of all named defendants, and has sustained and is sustaining damages both physically and mentally, the consequences of which carry the potential to be far-reaching and permanent, as the viability of colostomy repair decreases with time and bodily atrophy from disuse." (Docket No. 1 at 5). Plaintiff "is being denied adequate medical care based on a dangerous and barbaric policy and/or custom in the interest of expenses, and at the expense of Plaintiff's general health and well-being. Denying Plaintiff's colostomy correction is deliberate indifference to a serious medical need, and does not meet the community standard of care." (Docket No. 1 at 6).

Based upon the above, the plaintiff brings one claim for relief, namely, for cruel and unusual punishment. He seeks only injunctive relief in the form of colostomy reversal surgery.

Attached to the Prisoner Complaint are plaintiff's grievances, DeCesaro's Step 3 denial, a letter from PA Jo Ann Stock in support of plaintiff's appeal to PHP, PHP's

response to PA Stock, PHP's denial of plaintiff's surgery request, an ADA form indicating plaintiff was entitled to the accommodation of ostomy bags and supplies as determined necessary by a medical provider, and a discharge form from Sky Ridge Medical Center in Lone Tree, Colorado. The latter states the following with respect to plaintiff's discharge plan: "He is advised to not lift any more than 10 pounds for a minimum of 6 weeks. The patient at that point can have his colostomy taken out in 8 to 12 weeks with either myself or with another surgeon. . . ." (Docket No. 1 at 17).

**PENDING MOTIONS**

Now before the court for a report and recommendation are the following two motions: (1) plaintiff's motion for a preliminary injunction (Docket No. 7) and (2) the defendants' motion to dismiss (Docket No. 30). Defendants filed a response to plaintiff's motion (Docket No. 28). Plaintiff filed a response to defendants' motion (Docket No. 40), defendants filed a reply (Docket No. 42), and plaintiff filed a "Final Reply" (Docket No. 43). The court has carefully considered all of these motion papers as well as applicable Federal Rules of Civil procedure and case law. In addition, the court has taken judicial notice of the court file. The court now being fully informed makes the following findings, conclusions of law, and recommendations.

Since the plaintiff is not an attorney, his pleading and other papers have been construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority,

his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . . At the same time, . . . it is [not] the proper function of the district court to assume the role of advocate for the pro se litigant." Id.

### Plaintiff's Motion for a Preliminary Injunction

Plaintiff asks the court to "grant a preliminary injunction to force the CDOC to have [his] colostomy reversal surgery performed." He asserts:

> Being made to live with my intestines exposed is causing me irreparable harm, and the conditions are current and ongoing. The amount of anxiety and horror I am forced to confront daily is having a very adverse effect on my mental state, and my physical condition carries the potential for deterioration and/or permanent damage the longer I am forced to wait; the possibility of medical complications is far-reaching and immediate.
>
> The potential for harm to myself is far greater than the harm the CDOC will face if this request for preliminary injunction is granted; I could spend the rest of my life permanently maimed; I could be sent back to prison after my release because of inability to find work and make payments, and I face the constant risk of infection and hernia. I experience very painful phantom bowel movements aside from the every day pain of an open-wound, and my level of anxiety is unimaginable.
>
> I believe I am very likely to win a trial, as the refusal to repair what was intended to be a temporary colostomy does not meet the community standard of care; with the current use of orthoscopics in ostomy repair, the procedure is not dangerously invasive or expensive.
>
> If, after deliberation by the court, the DOC is found not liable for the cost of the surgery, (which I absolutely believe they are), I would gladly accept being billed for the procedure, and I would make prompt, complete payment(s); but the procedure itself is not something which can wait for extensive argument in the meantime, and needs to be performed immediately.

(Docket No. 7 at 1-2).

In order to obtain a preliminary injunction, plaintiff must demonstrate the

6

following: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the plaintiff if the preliminary injunction is denied; (3) the threatened injury to the plaintiff outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003). In addition, the right to relief must be "clear and unequivocal" because "a preliminary injunction is an extraordinary remedy." Id.

Here, where the relief requested in a preliminary injunction would (1) disturb the status quo, (2) be mandatory as opposed to prohibitory, or (3) provide the plaintiff with substantially all the relief he may recover after a full trial on the merits, an even heavier burden is placed upon him, and he must show that the four factors listed above weigh "heavily and compellingly in his favor." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001). "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003). Plaintiff has failed to do so, and his motion should be denied.

First, as found below with regard to the discussion of the defendants' motion to dismiss, plaintiff does not have a substantial likelihood of success on the merits of the case. In fact, this court is recommending that the defendants' motion to dismiss be granted.

Second, plaintiff's arguments concerning the medical need for the colostomy reversal and the alleged irreparable injury that would occur if surgery is not performed immediately are conclusory and speculative. In contrast, defendants have submitted

copies of portions of the plaintiff's medical records and affidavits of defendants Frantz and Krebs which show that plaintiff's ostomy is medically supervised, staff have documented that the ostomy site is mature and functioning well, the risk of problems with the ostomy site once the ostomy is mature is extremely small, and a well-healed, completely functioning ostomy, such as the plaintiff's, is not considered an illness or disease and is compatible with a completely normal life span.  Thus, plaintiff has not established that there would be irreparable injury if the preliminary injunction is denied.  In fact, according to the defendants, there are risks with the surgery plaintiff seeks, including the risk of anesthesia and complications which occur on a fairly frequent basis, including infections which occur in approximately 21 to 22 percent of cases, and even death, which is an infrequent complication but does occur.

Dr. Krebs states that her review of the plaintiff's medical records show the following.  On March 20, 2009, plaintiff had an intake physical performed at the Denver Reception and Diagnostic Center.  The medical chart documentation shows that plaintiff has had a colostomy since September 2008 which was performed prior to incarceration as the result of a car accident in which he was severely injured.  "A colostomy is an opening, or stoma, that connects the colon to the surface of the abdomen as a pathway for intestinal waste." (Docket No. 28-2 at 2, ¶ 9).  Plaintiff was seen by nursing staff on April 15, 2009, because plaintiff submitted a "kite" in which he requested a reversal of the colostomy.  "Colostomy reversal restores the function of the intestine and the rectum." (Docket No. 28-3 at 3, ¶ 11).  The nursing staff documented the wafer and ostomy bag were in place on the colostomy and that there appeared to be no problems with the ostomy.  Plaintiff was referred to a provider.  The following day he was

evaluated in a clinic by a provider due to plaintiff's request to have the colostomy reversed. The provider requested a surgical consult for the colostomy reversal, and plaintiff was provided with colostomy supplies. On April 26, 2009, nurses documented that they were educating plaintiff about the care of his ostomy.

On May 11, 2009, the surgery consult was denied by CHP as not being medically necessary. CHP documented prior conversations with Dr. Frantz regarding colostomy reversal and her opinion that colostomy reversal is not medically necessary and completely elective. Plaintiff submitted a grievance on June 22, 2009. Eight days later, PA Stock appealed the surgical denial consult, stating in her letter, "We, as medical providers, all know that the longer this colostomy is left in place, the less likely it will be to have a successful take down."

Dr. Frantz believes Stock's statement is false. According to Frantz,

> There is a minimum amount of time that must pass from the placement of a colostomy to reversal, and this time is usually eight to twelve weeks. The minimum time is important in order to allow treatment and clearing of infection/bacteria that may be present in the abdominal cavity, and to allow scar formation to be more stable. The reversal can occur any time after the passing of the minimum time interval. The reversal of a colostomy is entirely a matter of convenience for the patient. There is no point in time after which the colostomy cannot be attempted, and in some patients, reversal occurs years after the original colostomy placement.

(Docket No. 28-3 at 3-4, ¶ 15). On August 9, 2009, CHP responded to plaintiff's appeal, noting that "the reversal of a colostomy is not medically necessary to maintain his ability to do his activity of daily living." (Docket No. 28-3 at 4, ¶ 16).

Plaintiff was evaluated at clinic on September 16, 2009, for another request for colostomy reversal. The exam documented that the ostomy was well-healed and appeared to be working well. That day, plaintiff filed a grievance requesting a

colostomy reversal. The provider's response notes that "on one of your kites, you requested to be able to see an outside provider (not DOC)," and the provider documented that plaintiff was provided with a copy of the administrative regulation that governs offender requests for outside providers.

On November 12, 2009, plaintiff was evaluated by nursing staff after the plaintiff requested additional ostomy supplies. The nurse attempted to do more teaching regarding the ostomy and the use of the supplies, but plaintiff refused the teaching.

On February 25, 2010, a "multidiciplinary staffing" was conducted in the clinic with the plaintiff because he was consistently late to work and/or education programs, claiming that he was late because of the ostomy and that he had to always empty his ostomy bag at that time. Plaintiff was advised by clinical staff that the colostomy was at the sigmoid colon and as such should have minimal increase in bowel movements compared to a person who does not have a colostomy (compared to a proximal colostomy or ileostomy where the draining is almost continual). Dr. Frantz notes:

> in many patients with distal colostomies such as this patient, they have nearly normal bowel movement frequency and timing with the need to empty the bag only once or twice daily. The patient will need to "burp" the bag much as a person without an ostomy passes gas. The offender did complain that he felt he needed more wafers per month and clinical staff agreed to increase his wafers to eight per month. The wafer is a thick, adhesive fabric that is cut to the shape of the ostomy and goes on the abdominal skin. It serves to protect the skin of the abdomen and has a plastic ring seal that is used to attach the ostomy bag. The seal is similar to that of a zip lock bag, only more durable. In my clinical experience, most individuals who have ostomies change the wafer only once a week. Proximal ostomies may require wafer replacement more often. The offender was advised to kite to clinic if he experiences any problems with his ostomy site.

(Docket No. 28-3 at 4-5, ¶ 20).

10

On October 8, 2010, case management documented a contact with the plaintiff who came in to discuss working full time, but he was reminded that he had issues with working in the morning before, and he said those issued had been resolved.

Dr. Frantz further states:

> There is a minimal amount of time that must pass before reversal can be considered, but there is no maximum amount of time. I even reviewed a number of ostomy blogs looking for evidence to support the offender's claim that it is medically necessary to reverse his colostomy. The blogs all made it very clear that it is individual choice to pursue reversal, and that reversal can occur years after placement. In addition, not only did the blogs contain patient stories of successful reversal, they also contained many stories of unsuccessful reversals.
>
> [] There is no medical support for the offender's position that the colostomy is causing him irreparable harm, that his physical condition carries the potential for deterioration and/or physical damage, that he could spend the rest of his life maimed, that he is faced with the constant risk of infection or hernia, or that the "community standard of care" requires reversal. The medical risk from a mature ostomy, such as this offender has, is minimal. The clinical staff have documented that the ostomy site is mature and is functioning well. Once the ostomy reaches that state, the risk becomes limited to problems with the ostomy opening, which this patient does not have. Again, the risk of problems with the ostomy site once the ostomy is mature is extremely small.
>
> [] Additionally, colostomy reversal is a surgical procedure that requires general anesthesia. There are risks with the surgery to include the risk of anesthesia. Colostomy reversals do have complications on a fairly frequent basis, to include infections occurring in approximately 21 to 22% of cases of ostomy reversal. Death is an infrequent complication, but does occur.

(Docket No. 28-3 at 5-6, ¶¶ 22-24). Dr. Frantz researched medical literature and found no support for the plaintiff's position that a colostomy becomes permanent simply because time passes.

Dr. Krebs similarly states in his affidavit (Docket No. 28-5) that he found no objective evidence of dysfunction related to the ostomy. The

> information provided documented no medical complications, such as malnourishment, weight loss, or other illness.
>
> [] Because Mr. Swarbrick's ostomy is fully functioning and stable, and there is no evidence of dysfunction, surgery to reverse the ostomy is an entirely elective procedure that is not medically necessary for the patient to perform all activities of daily living.  Conversely, the elective surgery that Mr. Swarbrick is requesting poses potential risks that include infection, other medical complications, and, infrequently, death.  Furthermore, procedures only for the convenience of the offender, such as an elective colostomy reversal, are excluded.
>
> [] In the past, I have discussed colostomy revision surgery with the CDOC Chief Medical Officer, Paula Frantz, MD, who confirmed that colostomy revision is an elective procedure that exposes the patient to potential medical complications without treating an underlying illness, and thus, is not a procedure that is provided by CDOC.
>
> [] A well-healed, completely functioning ostomy is not considered an illness or disease and is entirely compatible with a completely normal life span.  Accordingly, I denied the colostomy revision request.
>
> [] Mr. Swarbrick does have the option to seek another opinion and to have the elective procedure at his own expense.

(Docket No. 28-5 at 2-3, ¶¶ 8-12).

Furthermore, the court notes that one of the documents plaintiff attached to his Prisoner Complaint, namely, a discharge form from Sky Ridge Medical Center, does not show that the surgery plaintiff seeks is required.  Instead, the doctor merely stated on that form, ""He is advised to not lift any more than 10 pounds for a minimum of 6 weeks.  The patient at that point **can have** his colostomy taken out in 8 to 12 weeks with either myself or with another surgeon. . . ."  (Docket No. 1 at 17) (emphasis added).

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.' . . .  Irreparable harm is not harm that is 'merely serious or substantial.'" Heideman, 348 F.3d at 1189 (citations omitted).  This court finds that plaintiff has not

established the requisite irreparable harm.

Third, plaintiff has not established that the threatened injury to him outweighs the injury to the other party under the preliminary injunction. Defendants correctly note that the plaintiff's allegations of risk of physical harm are conclusory and unsupported by the medical injury. In contrast, defendants assert that the risk to the CDOC if the injunction were granted would be great because enjoining them to authorize elective surgery only for plaintiff's convenience and desire would result in a deluge of similar requests. For example, defendants note that inmates with fully-functioning joints might request total joint replacement surgeries which while not medically necessary would make their lives more convenient. This court agrees with the defendants that the injunction here would undermine the clinical services CDOC provides and the legitimate limits it must place on clinical services.

Finally, plaintiff has not established that the injunction is not adverse to the public interest. Defendants have show that the CDOC has an interest in providing health care to more than 20,000 inmates incarcerated in state institutions. In order to do so, CDOC must allocate its funds so that inmates received medically necessary care, and absent a constitutional violation, the court should not interfere with CDOC's allocation of its resources. Requiring elective surgery when not medically necessary would be adverse to the public interest.

Based upon the findings above, this court concludes that the plaintiff has not shown that the four factors listed above weigh heavily and compellingly in his favor and that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. Therefore, it is recommended

that plaintiff's motion for a preliminary injunction be denied.

### Defendants' Motion to Dismiss

Defendants seek dismissal of the Prisoner Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the following grounds: (1) plaintiff fails to state a claim against Step 3 Grievance Officer DeCesaro and (2) the Complaint fails to state an Eighth Amendment violation. Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss pursuant to Rule 12(b)(6) alleges that the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts to state a claim to relief that is plausible on its face.'" Cutter v. RailAmerica, Inc., 2008 WL 163016, at *2 (D. Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Twombly, 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. "[A] plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider,

493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Twombly, 127 S. Ct. at 1974).

The Tenth Circuit Court of Appeals has held "that plausibility refers 'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" Khalik v. United Air Lines, – F.3d –, 2012 WL 364058, at *2 (10th Cir. Feb. 6, 2012). The Circuit court has further "noted that '[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context.'" Id. The court thus "concluded the *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" Id.

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in the plaintiff's favor. Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998); Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996). However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ." Khalik, supra at *2 (quoting Iqbal, 129 S. Ct. at 1949)). "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id.

In this case, defendant DeCesaro is a Step 3 Grievance Officer for the

15

CDOC who reviewed plaintiff's grievance records and denied plaintiff's request for relief. Plaintiff attached to his Prisoner Complaint DeCesaro's decision on plaintiff's Step 3 grievance. (Docket No. 1 at 9). DeCesaro stated therein in pertinent part:

> I have reviewed your Step 3 grievance that you filed with regard to medical.
>
> In review of this matter I find that you have been medically evaluated by providers at SCF. I cannot second guess the medical, professional opinion of those professionals regarding your diagnosis and treatment, as I am not a medical professional. Your request for colostomy reversal surgery was denied by PHP as not medically necessary. Dr. Frantz' opinion regarding these colostomy reversal surgeries is known to PHP based upon past discussions with her, which is taht the surgery is an entirely elective procedure. I am not qualified [to] determine the medical efficacy of this opinion. You may however request a private physician appointment at your expense, if approved, per AR 700-21. I do not find that DOC was or is deliberately indifferent to your medical condition and therefore I cannot recommend any relief in this matter.
>
> It is your burden to prove your allegations stated in your Step 3 grievance. I have reviewed the facts of this case and determined that you did not meet this burden. There was no corroborating evidence to provide proof of your allegations.
>
> Your request for relief is denied. This is the final administrative response in this matter and you have exhausted your administrative remedies.
>
> . . .

(Docket No. 1 at 9).

This court finds that the plaintiff's claims against grievance officer DeCesaro do not state a claim for deliberate indifference and thus do not state an Eighth Amendment violation. See Thomas v. Ortiz, 2007 WL 3256708, at *3 & 4 (D. Colo. Nov. 1, 2007) (inmate failed to state a claim of deliberate indifference against

grievance officer DeCesarro). "[B]ecause the state prison grievance procedure does not create any constitutional rights, DeCesaro cannot be held liable under a constitutional deliberate indifference theory for being a decision-maker in the grievance process." Id. at *4. "Finally, . . . a step 3 grievance officer cannot be held liable in a Section 1983 case, because Plaintiff cannot allege that DeCesaro in any way directly caused or participated in the failure to provide constitutionally required medical care." Id. "The courts require direct, personal participation in the alleged constitutional violations, and DeCesaro's only alleged involvement here were actions he took as the step 3 grievance officer. . . In the Tenth Circuit, constitutional allegations against an actor whose only involvement was during the grievance process do not state a claim." Id. Therefore, this court recommends that plaintiff's claim against DeCesaro be dismissed. See Walker v. Meyer, 2009 WL 961490, at *4 (D. Colo. Apr. 7, 2009) ("[M]ere participation in the grievance process is an insufficient basis for asserting a violation of constitutional rights.").

This court also agrees with the defendants that the plaintiff has failed to state an Eighth Amendment violation. In order to state an Eighth Amendment claim, "'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. . . . The test for constitutional liability of prison officials 'involves both an objective and a subjective component.'" Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). As the Tenth Circuit has explained:

> to properly set forth an Eighth Amendment claim on which relief may be granted, [the prisoner] must set forth facts demonstrating [1] that his alleged medical need . . . was sufficiently serious to meet the objective element of the deliberate indifference test, *and* [2] that the Defendants' delay in meeting that need caused him substantial harm. Finally, to meet the subjective element of the deliberate indifference test, [the prisoner] must allege facts supporting an inference [3] that Defendants knew about and disregarded a substantial risk of harm to his health or safety.

Oxendine v. Kaplan, 241 F.3d 1272, 1276-77 (10th Cir. 2001) (quotations omitted).

Here, plaintiff does not assert that he is being denied treatment of his ostomy. Instead, he is asserting that he is being denied a surgical reversal. Defendants, however, are of the opinion that such surgery is not medically necessary and is instead elective. Refusal to provide a particular course of treatment preferred by the plaintiff does not constitute deliberate indifference. See Perkins v. Kansas Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"). A medical difference of opinion is not actionable under the Eighth Amendment. Fitzgerald v. Corrections Corp. of Am., 403 F.3d 1134, 1142 (10th Cir. 2005). See Ayala v. Terhune, 195 Fed. Appx. 87, 90-91 (3rd Cir. Aug. 15, 2006) (inmate's claim that the medical defendants should have approved the colostomy reversal surgery suggested years before by a doctor and should have referred him to a specialist who could perform the surgery were "simply not enough, in and of themselves, to state a claim under the Eighth Amendment. . . . In short, although [plaintiff] would have preferred a different course of treatment, his preference does not establish a cause of action."). While plaintiff claims he suffers from mental distress as a result of his colostomy, he has not alleged that he has sought and been denied mental health

treatment to address his distress.

In sum, this court finds that the plaintiff has failed to state an Eighth Amendment claim and thus recommends that the defendants' motion to dismiss be granted.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Plaintiff's Motion for Preliminary Injunction (Docket No. 7) be **denied**. It is further

**RECOMMENDED** that the Defendants' Motion to Dismiss (Docket No. 30) be **granted**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Date: February 21, 2012          s/ Michael J. Watanabe  
       Denver, Colorado          MICHAEL J. WATANABE  
                                          United States Magistrate Judge